IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ANTHONY D. WILLIAMS,

        Plaintiff,

v.                                      Case No. 16-3044-JWB

KRISTINE AULEPP, *et al.,*

        Defendants.

MEMORANDUM AND ORDER

    This matter is before the court on Defendants' joint Motion to Dismiss (Doc. 71), and on Plaintiff's Motion for Extension of Time (Doc. 127), Motion to Appoint Counsel (Doc. 128), Motion to Continue (Doc. 130), Motion to Enlarge Page Limit (Doc. 131), and Motion for Leave to Supplement (Doc. 133.) The motions have been adequately briefed (Docs. 129, 132, 134, 135, 136), and the court is prepared to rule. For the reasons stated herein, Defendants' Motion to Dismiss (Doc. 71) is GRANTED with respect to all remaining claims and parties. Plaintiff's various motions (Docs. 127, 128, 130, 131, 133) are DENIED or GRANTED IN PART as further described herein.

    **I. Background**

    Plaintiff is an inmate in the custody of the United States Bureau of Prisons (BOP) serving a 324-month sentence for conspiracy to possess with intent to distribute cocaine base. His projected release date, with application of good conduct time, is November 1, 2022. His pro se Amended Complaint (Doc. 18) asserted twenty-four separate counts against various federal officials, mostly BOP employees at the United States Penitentiary (USP) at Leavenworth, Kansas. (Doc. 18). *See also* Doc. 19 (accompanying affidavit). The claims primarily challenged the adequacy of medical

care provided to Plaintiff, alleged the Defendants retaliated against Plaintiff for filing grievances, and claimed Defendants unlawfully seized Plaintiff's property. The complaint cited *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971)*,* the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346, and 42 U.S.C. §§ 1985 and 1986 as bases for the court's subject-matter jurisdiction. Judge Crow screened the Amended Complaint and dismissed various counts, in whole or in part, as well as various Defendants.[1] (Doc. 25.) He also dismissed the FTCA and §§ 1985 and 1986 claims, leaving only *Bivens* claims, and only as to the following counts: 6-9, 12, 13 (as to Defendant Glenna Crews only), 14 (as to Defendant Jarad Herbig only), 15 (as to Defendant Paul Leonhard only), 16 (as to Defendants Claude Maye and John Johnson only), and 19 (only as to the denial of a "bottom bunk pass"). (Doc. 25.) These counts allege deliberate indifference to Plaintiff's medical needs in violation of the Eighth Amendment (Counts 6, 7, and 19), violation of First Amendment rights (Counts 8 and 9), retaliation for exercising First Amendment rights (Counts 12 through 16), and denial of due process in violation of the Fifth Amendment (Counts 13 through 16).

On September 11, 2017, Defendants filed a joint motion to dismiss the Amended Complaint. (Doc. 71.) Plaintiff responded by filing approximately ten motions seeking discovery, extensions of time, and other relief. On January 9, 2018, Judge Melgren denied Plaintiff's requests and stated that Plaintiff's response to the motion to dismiss was due January 23, 2018. (Doc. 100.) Plaintiff responded by filing numerous additional motions over the following months, including additional motions for extension of time.

On May 21, 2018, after the case was transferred to the undersigned judge, the court found that Defendants' motion to dismiss should be converted to a summary judgment motion because

---

[1] The order dismissed Defendants Lynch, Samuels, Witt, Connors, John/Jane Doe, Clark, and the United States. (Doc. 25 at 26.)

it relied on various attached exhibits. (Doc. 125.) The court gave notice to the parties and granted Defendants until June 15, 2018, to file a supplemental brief with any additional exhibits.[2] The court granted Plaintiff until July 6, 2018, to file a response brief with exhibits. (*Id.* at 2.) The court denied Plaintiff's various other motions and cautioned him that "no further extensions of time to respond to Defendants' motion will be granted." (*Id.*)

Plaintiff responded by filing an additional motion for extension of time (Doc. 127), a motion to appoint counsel (Doc. 128), and a motion for continuance (Doc. 130). On July 16, 2018, Plaintiff filed a motion to enlarge page limits (Doc. 131), a motion for leave to supplement (Doc. 133), and an 87-page response to the motion for summary judgment accompanied by a 49-page affidavit and other exhibits. (Doc. 132.)

**II. Preliminary Motions (Docs. 127, 128, 131, and 133.)**

On June 26, 2018, Plaintiff filed a motion (Doc. 127) for extension of time to respond to Defendants' summary judgment motion. The facts asserted by Plaintiff warrant no further extension of time. Plaintiff has had ample time to file his response and he fails to show that discovery is necessary to the filing of his response. Plaintiff has not demonstrated cause for any further extensions. Additionally, the court will deny the motion as moot because Plaintiff has now filed a response brief (Doc. 132.)

Plaintiff also filed a motion to appoint counsel (Doc. 128), the fourth such motion he has filed in this case. There is no constitutional right to appointment of counsel in civil cases. *Durre v. Dempsey*, 869 F.3d 543, 547 (10th Cir. 1989). In considering a motion for appointment of counsel under 28 U.S.C. § 1915, the court considers the merits of a prisoner's claims, the nature and complexity of the factual and legal issues, and the prisoner's ability to investigate the facts and

---

[2] Defendants subsequently elected to stand on their initial brief and exhibits. (Doc. 126 at 2.)

present his claims. *Hill v. SmithKline Beecham Corp.*, 393 F.3d 1111, 1115 (10th Cir. 2004) (citations omitted). The court will deny Plaintiff's current request for largely the same reasons cited by Judge O'Hara in denying Plaintiff's previous motion for counsel. (*See* Doc. 91 at 2.) At this stage, Plaintiff has not shown that the merits of his claims warrant appointment of counsel. Additionally, the claims deal with facts and issues with which Plaintiff has significant familiarity, and he has demonstrated an ability to gather facts and present his claims to the court. His motion for appointment of counsel is accordingly denied.

Plaintiff's motion to enlarge page limits (Doc. 131) is granted with respect to Plaintiff's 87-page response brief (Doc. 132), but is otherwise denied.

Plaintiff's motion for leave to supplement asserted that Plaintiff only "file[d] half of his opposition" in the summary judgment response because the court has not ruled on his other motions. (Doc. 133 at 2.) Plaintiff asked that he be allowed to file his remaining opposition and exhibits "in the next seven (7) to fourteen (14) days." (*Id.* at 3.) Plaintiff filed an additional brief on August 6, 2018, with exhibits attached. (Doc. 136). The court will consider the latter brief and exhibits as a supplement to Plaintiff's response to summary judgment. Accordingly, Plaintiff's motion for leave to supplement (Doc. 133) is granted to that extent, but is otherwise denied. Plaintiff has not demonstrated that he cannot present facts essential to his opposition to summary judgment without further extensions or discovery.

### III. Defendants' Motion for Summary Judgment (Doc. 71.)

### 1. Summary Judgment Standards

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and an issue of fact is "genuine"

if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Haynes v. Level 3 Commc'ns*, 456 F.3d 1215, 1219 (10th Cir. 2006). The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol—Myers Squibb Co*., 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). The nonmovant must then bring forth specific facts showing a genuine issue for trial. *Garrison v. Gambro, Inc*., 428 F.3d 933, 935 (10th Cir. 2005). The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

**2. Uncontroverted facts.**

*Exhaustion of Administrative Remedies*. The PLRA provides that a confined prisoner cannot bring an action "with respect to prison conditions" under any federal law "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The BOP has a four-part administrative remedy to address inmate complaints concerning any aspect of confinement. (Doc. 72-2 at 3) (citing BOP Program Statement 1330.18, *Administrative Remedy Program*, available at www.bop.gov.). *See also* 28 C.F.R. § 542.10 et seq. (regulations adopting administrative procedures). Under that program, an inmate is first required to attempt informal resolution. If that is unsuccessful, the inmate must submit a formal written Administrative Remedy Request to the Warden of the institution within 20 days of the incident. *See* 28 C.F.R. § 542.14. If the inmate is not satisfied with the Warden's response, he may submit an appeal to the appropriate Regional Director within 20 days. (There are certain exceptions, such as disciplinary decisions by a Discipline Hearing Officer, which may be appealed directly to the Regional Director.) An inmate not satisfied with the Regional Director's response may appeal to the General Counsel within 30 days. Appeal to the General Counsel is the final administrative appeal. *Id.* § 542.15. The foregoing

time limits may be extended when an inmate shows a valid reason for delay. *Id.* Also, inmates may have another person (including outside sources such as family) assist them in preparing a Request or an Appeal. *Id.* § 542.16.

The BOP maintains a nationwide computer database of inmate complaints under the Administrative Remedy Program known as SENTRY, that tracks inmate complaints and appeals. (Doc. 72-2 at 4.) A search of SENTRY shows Plaintiff has filed 411 administrative remedies and appeals since his transfer to USP Leavenworth on October 23, 2013, including 113 appeals to the National Appeals Administrator. (*Id.* at 5.) Although Plaintiff has clearly been able to exhaust remedies on a multitude of claims, Defendants cite evidence that he did not do so with respect to some of the allegations he now asserts. Specifically, Defendants cite evidence that Plaintiff did not exhaust a claim that Defendant Maye violated his First Amendment rights by threatening him on or about March 25, 2014, or by transferring him out of USP Leavenworth (Counts 9, 16). (*Id.* at 8-10; Doc. 72-2 at 101-02.) They cite evidence that Plaintiff did not exhaust remedies as to allegations that Defendant Leonhard used a racial slur (Count 15). (*Id.* at 8-9; Doc. 72-2 at 88, 93.) Finally, Defendants cite evidence that Plaintiff did not exhaust remedies as to claims that Defendant Johnson retaliated by transferring Plaintiff from USP Leavenworth (Count 16.) (*Id.* at 9-10; Doc. 72-2 at 101-02.)

*Defendant Justin Blevins*. Commander Justin Blevins served as USP Leavenworth's Health Services Administrator while Plaintiff was at USP Leavenworth. He was a member of the Public Health Service and was providing medical services within the scope of his employment at all times relevant to this suit. (Docs. 72 at 10, 72-2 at 74.)

*Medical treatment at USP Leavenworth*. Prior to his incarceration, Plaintiff suffered from multiple medical conditions, including a foreshortened gut due to a gunshot wound in

approximately 1995, removal of a kidney, and a gunshot injury to his leg. Plaintiff asserts that he also underwent surgery for a stomach ulcer. Since the start of his incarceration in 1998, Plaintiff has suffered from chronic abdominal pain. He has repeatedly sought treatment for abdominal pain at each of the numerous federal institutions where he has been housed. He has also filed grievances at each of these institutions, alleging that the medical care he received for his pain was inadequate. In 2010, while he was housed at a facility in California, Plaintiff suffered a ruptured gallbladder and had to have emergency surgery. (Doc. 132-1 at 1-5.)

On April 6, 2012, while Plaintiff was housed at a facility in Oregon, he received an esophagogastroduodenoscopy (EGD) and colonoscopy with biopsies, which revealed a normal post-surgical stomach with Billroth II Anastomomosis. The post-operative diagnosis indicated a normal colon with no ulcers, inflammation, polyps or diverticula, and the terminal ileum also appeared normal. The medical provider noted that Plaintiff had heartburn that was presumably caused by bile reflux, although it did not appear to create any notable gastropathy or esophagitis. (Doc. 75 at 3-4.) Plaintiff was prescribed a special diet consisting of six small meals a day, no red meat, and a bland diet. (*Id.* at 17-22.) The special diet order was set to expire on January 1, 2014.

Plaintiff had issues complying with his special diet. At La Tuna FCI in Texas, where Plaintiff was housed prior to arrival at USP Leavenworth, a nurse noted on August 31, 2013:

> Inmate states that he had been told 3 times to change his [commissary] purchases and continues to purchase spicy, acidic food that are [sic] not correlated and AMA of a bland diet. Upon shake down of inmate's cell in [Special Housing Unit] on 8/30/13, 3 large bags full of items from food services stashed under bed containing apples, tuna, bread, and snickers. [sic] Plan is to [discontinue] 6 meals/day. Inmate may resume bland diet as per self but [without] extra meals that are not being eaten.

Doc. 75 at 23.  The note was co-signed by a medical provider.

On September 10, 2013, Plaintiff received a consultation with a dietician upon a referral of the Regional Medical Director at La Tuna because of Plaintiff's complaints of stomach pain and

acid reflux. The dietician recorded that Plaintiff admitted being noncompliant with his medication (omeprazole and simethicone) and his diet. The provider's note stated that Plaintiff would benefit from a bland diet consisting of six small meals per day, but it was "imperative that he is also compliant with medications and commissary purchases." The note indicated that Plaintiff acknowledged understanding "that if he hoards snacks again the snack order will be [discontinued.]" (Doc. 75 at 25.)

Plaintiff was transferred from FCI La Tuna to USP Leavenworth on October 23, 2013. Upon arrival, a complete intake screening was performed, and Plaintiff was instructed on how to obtain medical services. During this encounter, Plaintiff was prescribed cyanocobalamin for malabsorption syndrome and lisinopril for hypertension. Plaintiff was again placed on a special diet of six small, bland meals per day and no red meat, which was scheduled to expire on October 22, 2014. (Doc. 76 at 3; Doc. 75 at 32.) Plaintiff was permitted to self-select the no-red-meat and bland diet options from the available menu at the regularly scheduled meals. He was also provided three snacks per day, which may have included peanut butter and crackers or bread, in compliance with options outlined in the BOP's policies.

On October 23, 2013, Robert King, D.O. (not named as a Defendant in this action) discontinued Plaintiff's prescriptions for omeprazole and simethicone, with a note that Plaintiff would be referred to the commissary for those medications. (Doc.75 at 33.) He did so because of standards in the BOP's National Drug Formulary, which includes a list of medications that BOP medical staff consider to be quality and cost-effective medications for inmates. Pursuant to the Formulary, stomach and heartburn medications (including simethicone and omeprazole) are available over-the-counter (OTC) for purchase by inmates at the commissary. The Formulary provides that inmates are to purchase their stomach medications through the commissary unless

they are indigent or, for "H2/PPIs" like omeprazole and ranitidine, unless the inmate is being actively followed in a GI Chronic Care Clinic with documented laboratory findings for specified conditions, including severe GERD and previous GI bypass or ulcer surgery. (Doc. 75 at 119.) According to Defendant Aulepp, Plaintiff did not qualify under these tests. Plaintiff asserts that he does qualify under the Formulary's standards because, according to him, he had ulcer surgery prior to his incarceration, a fact he allegedly told Defendant Blevins. Plaintiff thus contends he should not have had to purchase omeprazole. (Doc. 132-1 at 22.)

On October 28, 2013, Plaintiff reported to sick call seeking a low-bunk pass, which he had possessed at some point at La Tuna FCI, and an order for his six small meals per day. He also reported the prior gunshot wound in his right leg. Radiology and laboratory requests were ordered to check Plaintiff's abdomen, right ankle, and left knee. An exam showed Plaintiff had a well-healed scar at his ankle and no limited use of his lower right leg. A low-bunk pass was not issued by the provider, Physician's Assistant Michael Swann. (Doc. 75 at 34.)

The next day, October 29, 2013, Plaintiff saw Aulepp, who continued his prescriptions for lisinopril and cyanocobalamin. Aulepp noted Plaintiff's history of gastrointestinal problems stemming from a foreshortened gut due to an 18-year old gunshot would, including frequent complaints of heartburn and diarrhea. Aulepp instructed Plaintiff to continue medication for his heartburn, which he could purchase through the commissary, and she renewed a dietician's recommendation for six small meals or three meals and three snacks per day. (Doc. 75 at 6, 39-40.)

Defendant Stanley was Assistant Food Service Administrator at USP Leavenworth. His duties included observing inmates to ensure dietary compliance with BOP rules. In November 2013, Stanley reported to Health Services that he saw Plaintiff give away his snack to another

inmate. (Doc. 76 at 5.) Plaintiff contends Stanley fabricated the story, and he cites affidavits from two other prisoners who say they did not see him give a snack away. A November 18, 2013, Health Services staff note entered by a registered nurse stated that a review of commissary items showed Plaintiff is purchasing "non-bland items such as honey pepper log, goya seasoning, Cajun chicken soup, garlic, etc. Consult with Food Service was completed. The inmate is sharing his snack sacks that he had been receiving." The note stated that "[d]ue to his non-compliance consult made with Dr. Aulepp. Received orders to discontinue special diet from Food Service." (Doc. 75 at 41.)

Aulepp approved the discontinuation of Plaintiff's special diet arrangement on November 18, 2013. BOP guidelines for medical diets provided that special diets should be ordered only when they are known to be effective for an inmate's specific medical condition. They further provided such diets may be discontinued if inmates are found to be providing special diet orders to other inmates, are not consuming supplemental feeding orders, or are stockpiling them. (*Id.* at 128.) The guidelines state that Food Service staff may document noncompliance, but only the authorizing medical provider may discontinue special or medical diets. (*Id.*) Aulepp states that she discontinued Plaintiff's medical order for six small meals per day due to Plaintiff's noncompliance with his special diet. Although the order was discontinued, Plaintiff was still free to self-select bland, no-meat options from the available menu for three daily meals. While Plaintiff was at USP Leavenworth, he gained approximately 30 pounds. He continued to purchase spicy, acidic food items from the commissary. (*Id.* at 136-158.)

On November 29, 2013, Plaintiff reported to sick call complaining of burning in his stomach. It was noted he was not buying the OTC medications as directed and that Plaintiff was "very adamant about not buying OTC." (*Id.* at 44.) He was prescribed ranitidine by PA Swann. (*Id.*)

Plaintiff reported to sick call on December 10, 2013, with concerns of arthritis in his ankle and hip, and complaining of swelling and tingling in the right lower leg. He reported that he had been given a low bunk pass at his prior institution. The medical provider, Dr. Jason Clark, examined Plaintiff and told him he did not meet the criteria for low-bunk placement because his arthritis was not to a degree that indicated accommodations. (*Id.* at 46-47.) On February 14, 2014, Plaintiff was evaluated at Health Services after claiming he fell off a chair while trying to get in his upper bunk, injuring his lower back. He was evaluated, diagnosed with a back sprain, and was prescribed ibuprofen. (*Id.* at 14.)  He was given a temporary low-bunk pass for seven days. (*Id*. at 52.)

Plaintiff complained by email on March 24, 2014, that he is "really unable to pay $14 for omeprazole" because of a $25 monthly fine he was also paying. He was advised that there were other, less expensive medications at the commissary, and that if his symptoms increased, he could return to sick call for evaluation. (*Id.* at 53.)

On March 30, 2014, Plaintiff reported to sick call that he had pain in his abdomen with nausea and vomiting. With Aulepp's approval, Plaintiff was referred to St. Luke's hospital for a CT scan of his abdomen. (*Id*. at 54.) At the hospital he was given a morphine injection for pain, medication for nausea, and fluids. The CT exam showed he had a history of extensive abdominal surgery, but no acute intra-abdominal process was identified. Plaintiff was discharged that day with a diagnosis of gastritis. He was prescribed pantoprazole (a PPI) and was directed to continue his prescriptions for cyanocobalamin and lisinopril. (*Id.* at 67.)

Plaintiff was evaluated at Health Services the next day, March 31, 2014, and was prescribed omeprazole for 14 days and instructed to purchase more of that medication in the commissary thereafter if it was needed. (*Id.* at 10, 74.)

On May 20, 2014, Plaintiff reported to sick call that he had been having abdominal pain for two weeks. He was evaluated and determined to be suffering esophageal reflux, and was prescribed simethicone tablets for seven days. Plaintiff was next seen on September 9, 2014, complaining of tiredness and loss of appetite. The provider determined he had malabsorption syndrome and ordered lab work, as well as radiology of Plaintiff's spine for a complaint of lower back pain. The test results were reviewed with Plaintiff on October 21, 2014, when his cyanocobalamin and lisinipril prescriptions were renewed.

On April 7, 2015, Plaintiff reported to sick call complaining of abdominal pain. He was seen by nurse David Campbell. Campbell noted Plaintiff was "very upset" about having to purchase his own antacid medication at USP Leavenworth, asserting he had been getting his antacids free for 15 years and did not understand why he had to pay for them now. (Doc. 75 at 91.) Campbell continued the same treatment, advised Plaintiff to purchase the antacids in the commissary, and told Plaintiff to return to sick call as needed. In early April 2015, Plaintiff sent several emails to Health Services complaining of its "refusal" to treat him. He asserted that the on-duty nurse did not "even get out of his chair" when examining him but simply ordered Plaintiff to buy antacids from the commissary. Plaintiff asserted that he had purchased antacid tablets on March 8, 2015, but they did not work and he could not tolerate the citrus flavored ones. He asked that Health Services issue him "an antacid that will help my pain and suffering…." (*Id.* at 96.) Plaintiff's commissary records show no antacid purchases in March of 2015, although there is a purchase of antacids indicated on April 7, 2015. Plaintiff only purchased antacids on three occasions in the course of his confinement at USP Leavenworth.

In a visit to Health Services on April 14, 2015, Plaintiff expressed concern about not getting omeprazole, stating he could not afford it and that ranitidine gave him gas. Dr. Clark instructed

Plaintiff to continue his current medications and discussed the use criteria for proton-pump inhibitors (PPIs) like omeprazole, indicating that Plaintiff did not qualify to obtain it free. That same day, Plaintiff sent an email to Defendant Phelps complaining of Clark's refusal to provide omeprazole, saying Clark wrongfully asserted that Plaintiff had not had ulcer surgery. (Doc. 75 at 100.)

On April 24, 2015, Plaintiff was evaluated at Health Services for complaints of abdominal pain and on his requests for a bland diet and omeprazole. The provider, Campbell, noted the commissary indicated Plaintiff did not eat a bland diet when he had the choice to do so, and also noted Plaintiff did not want to buy omeprazole because he had always been able to get it free. (*Id.* at 102.) Plaintiff was counseled about his diet selections. Plaintiff emailed Blevins later that day, complaining that Campbell had merely told him to try a different antacid when he complained that the one he tried did not work, even though Plaintiff asserted that the one recommended by Campbell "had a bad side [effect]." (*Id.* at 105.) Plaintiff asserted it was "cruel and unusual punishment and is causing a financial burden when you continue to deduct money off my person[al] account just to be told to go buy medication from [the] commissary…." (*Id.*) Notwithstanding his conclusory assertion of a "financial burden," Plaintiff cites no evidence that he was indigent such that he could not afford to purchase stomach medications at the commissary. (*See* Doc. 72-2 at 79 (Regional Director's ruling on Plaintiff's grievance, noting that "[a]ccording to your electronic funds report, you are not currently on the indigent list. Therefore, purchase of Omeprazole must be initiated by you from the commissary."))

*Count 13 – Disciplinary Hearing on Incident 2940024.* Plaintiff contends his rights under the First and Fifth Amendments were violated by Disciplinary Hearing Officer (DHO) Glenna Crews. On September 9, 2013, Plaintiff was charged with disciplinary violations at FCI La Tuna

under Incident Report No. 2940024. The report alleged that when an officer attempted to move Plaintiff from the law library and ordered him to "cuff up," Plaintiff responded, "FUCK NO I'M NOT GOING TO CUFF UP" and told the officer to "COME IN HERE SO I CAN FUCK YOU UP." (Doc. 72-5 at 9.) The report alleged that Plaintiff then threatened to "jump" the officer in the compound and said he was going to file a grievance. Plaintiff was charged with disciplinary violations and on September 30, 2013, a DHO at La Tuna found Plaintiff responsible for violating Code 307 (Refusing to Obey an Order) and Code 312 (Insolence Toward a Staff Member), but removed Code 299 (Disruptive Conduct) and Code 203 (Threatening). The DHO imposed sanctions, but they did not include loss of good conduct time. (*Id.*)

Plaintiff appealed to the Regional Director, who remanded for reconsideration with instructions. The instructions stated (among other things) that the description of the incident supported a Code 203 violation, that Code 203 should therefore replace Code 312, and that "the sanctions should be in compliance with policy if the incident report is upheld by the DHO" on reconsideration. Because Plaintiff had been transferred to USP Leavenworth by that point, the matter was assigned to DHO Crews for reconsideration.

Crews considered the evidence and found Plaintiff's actions violated Code 203 (Threatening) and Code 307 (Refusing to Obey an Order). Code violations in the 200s were considered more serious and included sanctions for loss of good conduct time, while violations in the 300s did not. Crews imposed a sanction of 27 days loss of good conduct time in addition to the sanctions Plaintiff had already served. Crews informed Plaintiff of his right to appeal. Plaintiff appealed, and the National Inmate Appeals Administrator determined that the increase in sanctions was improper under a policy generally prohibiting a reviewing warden or regional director from increasing a valid sanction. The Administrator remanded for entry of an amended DHO report that

restored the original charges and sanctions imposed at La Tuna, with no loss of good time. An amended report restoring the original sanctions was issued to Plaintiff on July 10, 2015. (Doc. 72-5 at 5.)

*Count 14 – Confiscation of property.* USP Leavenworth had policies in effect permitting inmates to possess only certain property, including property authorized by staff or purchased by the inmate at the commissary. Any other items were considered contraband, which staff was directed to seize. Such items were inventoried and stored pending identification of the true owner (if in doubt) or disciplinary action. Staff was directed to give the inmate a form giving the inmate seven days to establish ownership.

On January 24, 2014, as Plaintiff attempted to pass through a metal detector on his way to the medical department, Defendant Witt found him in possession of papers and magazines that had the address labels torn off or that were addressed to other inmates. Witt seized them as contraband. Plaintiff contends Witt disposed of the items without giving him a confiscation form, although he fails to address Defendants' evidence that Witt told Plaintiff to return on the next inmate move to obtain a confiscation form, and that Plaintiff did not return for a form. (Doc. 72 at 23-24.) The inmate whose address appeared on the labels was no longer at USP Leavenworth. The items were disposed of.

USP Leavenworth also had a policy prohibiting inmates from wearing jewelry, except for certain items including a religious medal and a non-decorative chain not exceeding $100 in value. An inmate wanting to purchase a religious item had to buy it at the commissary or through a chaplain-approved catalogue, with approval by the warden. On February 5, 2014, as Plaintiff was again passing through the metal detector, Witt found Plaintiff wearing a beaded necklace with an emblem, which appeared to be homemade and not a commissary item. Plaintiff said it was his

religious medallion. Witt said it was not authorized and that Plaintiff would have to send it home. Plaintiff handed it over; it was a beaded necklace with an "NOI [Nation of Islam] emblem." A confiscation form was prepared on February 5 but Plaintiff refused to sign it. About four months later, the item was disposed of because it was not claimed. (Doc. 72-8.)

Plaintiff contends Defendant Herbig "implicitly authorized, approved and knowingly acquiesced in the unlawful seizure of my [newspapers], magazines and chain of Ms. Witt when it was brought to his attention" and he "refused to properly investigate the retaliation claim" Plaintiff made against Witt. (Doc. 19 at 19.) Aside from these conclusory statements, he cites no evidence to show Herbig's responsibility or actions with respect to these incidents.

*Count 15 – Fifth Amendment claim.* Plaintiff claims Leonhard made a "disrespectful comment" while Plaintiff was attempting to talk to Herbig about a grievance over the seizure of Plaintiff's chain. Plaintiff says he proposed dropping the grievance if Herbig would give back the chain, to which Leonhard allegedly stated, "That's not going to happen." (Doc. 19 at 27.) Plaintiff responded by saying that he was talking to Herbig, which according to Plaintiff prompted Leonhard to become angry and threaten to "lock your black ass up in the fucking shoe."[3] Leonhard then allegedly "attempted to handcuff [Plaintiff] in a very aggressive way." (*Id.*) Plaintiff asserts that as a result, he was fearful of being attacked by Leonhard if he filed a grievance. Nevertheless, Plaintiff "made it out [of] the (SIS) office without being attacked," and immediately went to the warden and "grieved to him what had taken place with his subordinates (SIS) Herbig and [Leonhard]." (*Id.*)

*Count 16 – Retaliatory Transfer.* Under BOP policies, when a transfer is proposed, a Unit Team first reviews and approves the transfer request. The request is submitted to the warden for

---

[3] "Shoe" was a reference to the penitentiary's Special Housing Unit.

signature, and then submitted to the Designation and Sentence Computation Center (DSCC) for approval of a transfer for application of a "management variable" – a determination by DSCC that a greater or lesser security level should be applied in the case of the particular inmate.

When a decrease in an inmate's security level is indicated by the inmate's Unit Team, transfer of the inmate to a lower security level institution is considered pursuant to "Code 308," a lesser-security transfer. The inmate's case must be referred to DSCC for transfer to a lower security facility or for DSCC to apply a management variable.

Lesser-security transfers may also be considered with "nearer-release" transfers. Nearer-release transfers move an inmate closer to their residence or to their ultimate release destination, consistent with their security level. Once an inmate has been transferred within 500 miles of his release residence, no further referrals of this type will be made. (Doc. 72-4 at 5-6.)

In February of 2015, following a periodic review, Plaintiff's security level was lowered from medium to low based upon a required period of good behavior. On February 19, 2015, Plaintiff submitted a request to be transferred to a facility closer to his family in California or Atlanta, Georgia. (*See* Doc. 72-4 at 26.) Plaintiff was denied a lower-security transfer on February 26, 2015, when DSCC applied a greater-security management variable that increased his security level to medium. (*Id.* at 5.) In doing so, DSCC cited a disciplinary violation

Based on Plaintiff's request for a transfer to be near family, on March 31, 2015, Johnson submitted a nearer-release transfer request for Plaintiff to the DSCC, noting Plaintiff had requested such a transfer. He pointed out that Plaintiff's children live in Atlanta and that Plaintiff intended to release to that area. (Doc. 72-4 at 28.) Maye approved the request. On April 21, 2015, DSCC approved Plaintiff for transfer to FCI Bennettsville in South Carolina, a medium-security facility located within 500 miles of Atlanta. Plaintiff was transferred to FCI Bennettsville on May 14,

2015. (Doc. 72-4 at 5-7.) Plaintiff subsequently filed a grievance because he was transferred to a medium security facility rather than a low security one. (*Id*. at 24.) He contends the management variable increase in his security level by DSCC was improper. (Doc. 132-1 at 34-35.)

### 3. Analysis

A. **<u>Official capacity claims.</u>** Defendants first assert that the court lacks subject matter jurisdiction insofar as the claims are asserted against Defendants in their official capacities. (Doc. 72 at 32-33.) The Amended Complaint states that the claims are asserted against the Defendants "in their individual and official capacities." (Doc. 18 at 2.) With respect to official capacity claims, Plaintiff contends the United States is a proper defendant because it would violate due process of law for the United States to allow its employees to punish a prisoner for exercising his rights. (Doc. 132 at 47.)

Plaintiff does not controvert Defendants' evidence that the individual Defendants were employees of the United States and were acting in their official capacities at the time of the alleged events. Under these facts, any official capacity claim against the Defendants is precluded. "There is no such animal as a *Bivens* suit against a public official … in his or her official capacity. Instead, any action that charges such an official with wrongdoing while operating in his or her official capacity … operates as a claim against the United States." *Watson v. Hollingsworth*, ___F. App'x ___, 2018 WL 3301445, *4 (10th Cir. 2018) (citations omitted). But "[s]overeign immunity … shields the United States, its agencies, and its officers acting in their official capacity from suit." *Id.* (quoting *Normandy Apartments, Ltd. v. U.S. Dep't of Hous.*, 554 F.3d 1290, 1295 (10th Cir. 2009)). Plaintiff has identified no facts or basis for finding a waiver of sovereign immunity by the United States. In fact, the court previously dismissed the United States from this action. (Doc. 25

at 26.) Accordingly, all remaining claims against the Defendants in their official capacities are dismissed for lack of jurisdiction.

**B. <u>Exhaustion of Administrative Remedies</u>.** Defendants contend that some or all of Counts 9, 12, 15, and 16 must be dismissed for Plaintiff's failure to exhaust administrative remedies. (Doc. 72 at 33) (citing the Prison Litigation Reform Act of 1995 (PLRA), 42 U.S.C. § 1997e(a)). In response, Plaintiff argues that administrative remedies were unavailable to him due to actions by prison officials, such that exhaustion is not required. (Doc. 132 at 13.) Among other things, Plaintiff argues he was "deterred from exhausting in a timely manner" by being transferred from FCI Bennettsville to FCI Williamsburg and because officials at FCI Williamsburg intentionally interfered "by not time-stamping" his grievances. (*Id.* at 15.) He alleges a number of other conditions also kept him from exhausting remedies – including racial violence in prison, Hurricane Harvey, "assaults … for filing grievances," being "illegally and unlawfully confined in segregation," and additional prison transfers. (*Id.* at 17.) He contends "[t]he intentional threats, assaults and abuse caused the administrative remedy process to become unavailable." (*Id.*)

Plaintiff fails to genuinely controvert Defendant's evidence that he failed to exhaust administrative remedies as to portions of Counts 9, 12, 15, and 16. He contends he was prevented from exhausting remedies by various acts of prison officials, but fails to show how any specific act prevented him from exhausting the claims discussed above. For example, he complains about his transfer from one South Carolina facility to another (Doc. 132 at 15), but fails to show how that prevented him from exhausting remedies on the above claims. He also asserts that officials retaliated or attempted to deter him form exhausting remedies, but he fails to support such conclusory allegations with specific evidence or explain how such acts rendered him unable to exhaust remedies. *See e.g.* Doc. 132 at 17-18 (Plaintiff claiming generally that "[t]he intentional

threats, assaults and abuse caused the administrative remedy process to become unavailable.") For example, he claims one official got mad at him about a grievance, used a racial epithet, and "attempted" to handcuff him. He alleges that the act was intimidating, but Plaintiff immediately asserted a grievance over the episode. Plaintiff's record of exhausting administrative remedies on a multitude of claims clearly shows the administrative process was not unavailable to him, and he fails to cite evidence from which a reasonable factfinder could conclude that prison officials deprived him of administrative remedies on the claims at issue. Accordingly, the portions of Counts 9, 12, 15, and 16 discussed above will be dismissed for failure to exhaust administrative remedies.

   **C. <u>Defendant Blevins</u>.** Defendants argue that Defendant Justin Blevins is absolutely immune from liability because he was an officer of the Public Health Service at the time alleged, and the claims against him arise out of the performance of his medical duties. (Doc. 72 at 34-35.) Plaintiff's response does not appear to address this argument. (Doc. 132.)

   Plaintiff's response does not controvert Defendants' evidence that Blevins was an employee of the Public Health Service and that the allegedly improper medical care he rendered was within the scope of his employment. Section 233(a) of Title 42, United States Code, precludes a *Bivens* action against an employee of the Public Health Service in such circumstances. *Hui v. Castaneda*, 559 U.S. 799, 806 (2010) ("Section 233(a) grants absolute immunity to PHS officers and employees for actions arising out of the performance of medical or related functions within the scope of their employment….") Accordingly, the claims against Defendant Blevins will be dismissed for lack of jurisdiction.

   **D. <u>Qualified Immunity</u>.** Defendants contend that Plaintiff's remaining claims are barred by qualified immunity. (Doc. 72 at 36.)

### i. Eighth Amendment claims (Counts 6, 7, and 19).

*Governing standards.* Counts 6 and 19 allege that Defendants Aulepp, Maye, and Phelps violated Plaintiff's Eighth Amendment rights by being deliberately indifferent to his medical needs.[4] Count 7 asserts an Eighth Amendment claim only against Aulepp. Plaintiff alleges that he was denied medical care and medication when he complained of pain, that he was denied a specialized diet prescribed by a physician, and that he was denied a pass for a bottom bunk despite a medical condition requiring one.

The standards governing Eighth Amendment claims such as these are as follows:

> A prison official's deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Deliberate indifference includes both an objective and a subjective component. The objective component is satisfied if the deprivation is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "[A] medical need is sufficiently serious 'if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)). The subjective component is satisfied if a prison official "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. The subjective component is not satisfied where the plaintiff simply complains of an "inadvertent failure to provide adequate care, negligent misdiagnosis, or ... difference of opinion with medical personnel regarding diagnosis or treatment." *Clemmons v. Bohannon*, 956 F.2d 1523, 1529 (10th Cir. 1992); *see also Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006) (noting that, "absent an extraordinary degree of neglect," the subjective component is not satisfied where a doctor exercises his or her "considered medical judgment").

*Jensen v. Garden.* No. 18-4048, 2018 WL 5099601, at *3 (10th Cir. Oct. 19, 2018).

Defendants assert the defense of qualified immunity, arguing Plaintiff either fails to state a valid claim under the Eighth Amendment or fails to show that Defendants' conduct violated

---

[4] Defendant Blevins was also named in Count 6 but, as indicated above, he is entitled to immunity under 42 U.S.C. § 233(a). *See* Pp.7-8.

clearly established law. (Doc. 72 at 37-39.) In *Jensen*, the Tenth Circuit summarized the qualified immunity analysis as follows:

> "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." [citing *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1311 (10th Cir. 2009)] (quoting *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009)). "In determining whether the plaintiff has met [his] burden ... , we will construe the facts in the light most favorable to the plaintiff ...." *Id.* A plaintiff's version of the facts, however, "must find support in the record." *Id.* "[M]ore specifically, '[a]s with any motion for summary judgment, [w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]'" *Id.* (second, third, and fourth alterations in original) (quoting *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008)).

*Jensen,* 2018 WL 5099601, *2.

<u>*Analysis of qualified immunity on Eighth Amendment claims*</u>. The court first addresses Plaintiff's claim that it was cruel and unusual punishment for Aulepp to discontinue the order for a special diet. The failure to provide a medically necessary diet can violate the Eighth Amendment. *Thompson v. Gibson*, 289 F.3d 1218, 1222 (10th Cir. 2002); *Ayers v. Uphoff*, 1 F. App'x 851, 855, 2001 WL 15543, *2 (10th Cir. 2001). But Plaintiff fails to show it was clearly established that discontinuing an order for six small meals under the circumstances known to Aulepp was a violation of the Eighth Amendment.

"[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Lee v. Tucker*, 904 F.3d 1145 (10th Cir. 2018) (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)). It is uncontroverted that after discontinuation of the special diet order, Plaintiff was still able to self-select bland, no-meat options from the regular menu at USP Leavenworth. As such, the only question is whether it violated his Eighth

Amendment rights to eliminate the three daily snacks he received in addition to regular meals. The uncontroverted facts show Plaintiff had a prior history of hoarding snacks. Plaintiff challenges the additional allegation that he gave away a snack to another inmate at USP Leavenworth, but there is no genuine dispute that a food service worker reported to Health Services that he had done so, and that Aulepp's decision to discontinue Plaintiff's diet order was based in part upon that report. Nor is there any dispute that Plaintiff continued to purchase spicy foods from the commissary that were not in keeping with his dietary recommendations and that he refused to purchase and use antacid medications as recommended by the medical staff.

BOP guidelines stated that a medical provider could terminate a supplemental feeding order if inmates were found to be providing the snacks to other inmates, if they were not consuming them, or if they were stockpiling them. The guidelines further provided that dietary supplements should not be authorized if there is a documented history of patient noncompliance. (Doc. 75 at 128.) In her declaration, Aulepp stated that she terminated Plaintiff's special diet based on his noncompliance. She also noted that despite discontinuance of the snacks, Plaintiff gained about 30 pounds while he was at Leavenworth, and she gave her opinion that Plaintiff received appropriate treatment for his medical conditions, including abdominal pain, during his incarceration at USP Leavenworth. (*Id.* at 14.) Aulepp's declaration does not specifically address the health risks or consequences to Plaintiff from discontinuance of the snack order. At the same time, Plaintiff cites no competent evidence of the health risk or consequences of discontinuing the snacks. Although he attributes his abdominal pain to the lack of snacks, the record shows that he suffered from abdominal pain both when he received snacks and when he did not.

Plaintiff cites no authority holding that the Eighth Amendment prohibited discontinuing an inmate's supplemental meals in similar circumstances. For the law to be clearly established, the

contours of the constitutional right at issue must be sufficiently clear that a reasonable official would understand that what she is doing violates that right. *Perry v. Durborow*, 892 F.3d 1116, 1123 (10th Cir. 2018) (citations omitted.) And the contours of a right are generally only sufficiently clear if a plaintiff: (1) identifies an on-point Supreme Court or published Tenth Circuit decision, or (2) shows the clearly established weight of authority from other courts has found the law to be as the plaintiff maintains. *Id.* Plaintiff identifies no such authority. On the contrary, some case law from the period indicates there were circumstances in which discontinuing a special or medical diet for noncompliance issues did not violate the Eighth Amendment. *See Easley v. Dep't of Corr.*, 2013 WL 1280167, *12 (S.D. Fla. July 26, 2013) (no deliberate indifference despite discontinuance of special diet for diabetic inmate); *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011) (no deliberate indifference where therapeutic diet temporarily revoked based on report of inmate throwing away food and missing meals).[5] The circumstances confronting Aulepp included Plaintiff's history of hoarding snacks, his failure to comply with dietary instructions, his failure to procure and take antacid medication, and a report that he had given away a snack item. Additionally, Aulepp was aware of and acted in reliance on a BOP regulation that appeared to authorize discontinuation of the special diet order in such circumstances. Plaintiff cites no case law showing that discontinuing a special diet order in such circumstances was a clear violation of the Eighth Amendment. Aulepp is accordingly immune from damages under the doctrine of qualified immunity. *See White v. Pauly*, 137 S. Ct. 548, 551 (2017) (for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate). The other named Defendants are entitled to summary judgment as well, as Plaintiff fails to show that they violated clearly established law in not preventing or altering Aulepp's

---

[5] The Eighth Amendment also requires a prison to provide "adequate" food to inmates. *Farmer v.* Brennan, 511 U.S. 825, 832 (1994). Plaintiff cites no evidence that he was not provided adequate nutrition at all times.

discontinuation of the special diet order. *See Arocho v. Nafziger*, 367 F. App'x 942, 956 (10th Cir. 2010) (warden's reasonable reliance on judgment of prison medical staff negates liability.)

Plaintiff next contends his Eighth Amendment rights were violated by Defendants' refusal to provide him omeprazole free of charge. The uncontroverted facts show that Plaintiff was told to purchase this medication from the commissary, but he refused to do so because he believed Defendants were required to provide it to him and he considered it a financial burden. Plaintiff fails to cite any evidence, however, that he did not have enough money to purchase the medication. Defendants are entitled to qualified immunity on this point as well, as Plaintiff cites nothing to show that Defendants' conduct violated a clearly established Eighth Amendment right. Case law has long held that the Eighth Amendment is not violated by requiring a financially-able inmate to pay for medication. *See e.g., Tijerina v. Patterson*, 507 F. App'x 807, 810 (10th Cir. 2013) ("Although a state must provide inmates with basic medical care, … we are not aware of any authority suggesting such care must be provided free of charge with respect to prisoners who have the ability to pay."); *Roberson v. Bradshaw*, 198 F.3d 645, 647 (8th Cir. 1999) (policy requiring inmates to pay for their medications if they can afford to do so did not violate constitution); *Andy Li v. Contra Costa Cty.*, No. 16-CV-02861-EMC, 2017 WL 4861487, at *14 (N.D. Cal. Oct. 24, 2017) ("It does not offend the Constitution for prison and jail officials to require inmates to pay for some of the costs of their medical care, so long as indigent inmates are not denied medical care due to their indigence."). These cases do not specifically address whether the Eighth Amendment requires prison officials to furnish an inmate with his prescribed medications first, with the understanding that his financial account can be debited, or whether the Eighth Amendment allows prison officials to refuse to issue medication on the grounds that the inmate has the ability to purchase it at a commissary. *Cf. McCall v. Johnson Cty. Sheriff's Dep't.*, 71 F. App'x 30, 31 (10th

Cir. 2003) (it is clearly constitutionally acceptable to charge inmates a small fee for health care where indigent inmates are guaranteed service regardless of ability to pay). Even assuming the Eighth Amendment might prohibit the latter option of not issuing the medication (a conclusion as to which the court offers no opinion), Plaintiff fails to show that such a right was clearly established when Aulepp or others refused to provide him omeprazole. *See e.g., Lanza v. Moclock*, No. 17-cv-1318, 2018 WL 3060030, *11 (M.D. Pa. June 20, 2018) (inmate's challenge to having to purchase pain reliever at commissary did not support Eighth Amendment claim); *Knight v. Woosley*, No. 18-CV-P34-JHM, 2018 WL 1512985, *4 (W.D. Ky. Mar. 26, 2018) (Eighth Amendment not violated by requiring inmate with the ability to do so to purchase OTC medications from commissary); *Poole v. Isaacs*, 703 F.3d 1024, 1027 (7th Cir. 2012) (inmate had sufficient funds in his trust fund account but opted to refuse treatment rather than part with his money; the delay in receiving care was of his own making). Defendants are accordingly entitled to summary judgment on this claim as well.

Plaintiff's third claim under the Eighth Amendment is based on the denial of a bottom bunk pass. Plaintiff contends that getting in and out of an upper bunk caused him pain due to a prior gunshot wound and arthritis. PA Swann, who ordered x-rays of Plaintiff's ankle and knee, concluded from his examination that Plaintiff's ankle scar was well healed and that he had no limited use of his right lower leg. He did not issue a pass. Dr. Clark denied Plaintiff's request for a pass on December 10, 2013, after examining him and noting no vascular, musculoskeletal, or neurologic problems. (Doc. 75 at 46.) Neither Swann nor Clark is named as a defendant in this action. Clark concluded that Plaintiff had some traumatic arthritis but it was not present to a degree that accommodations were indicated. Even assuming such a medical judgment was erroneous, it will not support an Eighth Amendment claim. The deliberate indifference necessary to amount to

cruel and unusual punishment is not satisfied by evidence of a merely negligent misdiagnosis or a difference of opinion with medical personnel concerning a diagnosis or treatment. *Jensen v. Garden*, ___F. App'x ___, 2018 WL 5099601, *3 (10th Cir. Oct. 19, 2018). The record shows that Swann and Clark examined Plaintiff and ordered diagnostic tests, but they ultimately exercised their medical judgment and concluded that Plaintiff's condition was not severe enough to warrant a bunk pass. "[T]he subjective component [of an Eighth Amendment claim] is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment." *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006). Plaintiff fails to cite evidence that these medical judgments – as well as Aulepp's asserted failure as the medical director to alter or change their findings - were not within the bounds of reason or that they otherwise indicated deliberate indifference to Plaintiff's health. Plaintiff thus fails to show that Defendants' action concerning denial of a lower bunk pass violated clearly established law.

Insofar as Counts 6, 7, and 19 include claims and/or Defendants in addition to those discussed above (*see* Docs. 18, 19), the court finds the Defendants are entitled to summary judgment on those allegations as well. The record shows that Plaintiff sought treatment for various complaints and that the medical staff at USP Leavenworth responded by taking steps to provide appropriate medical care. They exercised medical judgment with respect to Plaintiff's complaints and provided diagnostic tests, counseling, medication, and emergency services. Defendants Maye and Phelps, the Warden and Associate Warden, reasonably relied on the judgment of the medical staff concerning the appropriate level of medical care for Plaintiff. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior.") No evidence has been cited to support

a claim that any of the Defendants violated Plaintiff's clearly established Eighth Amendment rights.

### ii. First Amendment/ Retaliation Claims (Counts 8, 9, and 12-16)

These counts are based in whole or in part on the First Amendment. They allege that various Defendants retaliated against Plaintiff for filing grievances by bringing disciplinary charges against him, by "fabricat[ing] a story to have his medical… diet discontinued," by denying his grievances, by denying him access to the courts, and by transferring him to another institution.

The court concludes these allegations fail to state a valid claim for damages. The Supreme Court has "declined to extend *Bivens* to a claim sounding in the First Amendment." *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009). *See also Reichle v. Howards*, 566 U.S. 658, n.4 (2012) ("We have never held that *Bivens* extends to First Amendment claims.")  In its most recent discussion of *Bivens*, the Court noted it had recognized a *Bivens* remedy in only three circumstances: for improper searches under the Fourth Amendment, for gender discrimination in violation of Fifth Amendment, and for cruel and unusual punishment in violation of the Eighth Amendment. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1854 (2017).  Extending *Bivens* beyond these circumstances "is now a 'disfavored' judicial activity," and should not be made available if there are "special factors counseling hesitation in the absence of affirmative action by Congress." *Ziglar*, 137 S. Ct. at 1857 (citations omitted).

There are substantial factors weighing against extension of a *Bivens* remedy to federal prisoners alleging First Amendment violations of the type claimed by Plaintiff. The Supreme Court has already recognized a *Bivens* remedy under the Eighth Amendment, which protects inmates from cruel and unusual punishment (including deliberate indifference to an inmate's health and safety). Moreover, Congress has waived immunity for some (but not all) tortious acts under the

FTCA, and has also authorized the BOP to establish an extensive administrative program for resolution of inmate grievances. Inmates thus have extensive procedural mechanisms and remedies available for legitimate grievances. *See Bush v. Lucas*, 462 U.S. 367, 368 (1983) (inappropriate to recognize *Bivens* remedy for federal employee claiming First Amendment retaliation because employees have meaningful remedies); *Clemmons v. United States*, No. 16-cv-1305, 2018 WL 4959093, *4 (D. S.C. Oct. 15, 2018) (adoption of PLRA provides inmate remedies and indicates Congress did not intend damage remedy; court declines to find *Bivens* cause of action for First Amendment claim.) Finally, recognizing a First Amendment damages remedy in this context could result in significant judicial interference with administration of prisons. This is especially true where disciplinary, transfer, and grievance issues are concerned. *Turner v. Safley*, 482 U.S. 78, 84–85 (1987) ("Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government.") Based on these factors, the court concludes that no *Bivens* remedy is available to Plaintiff on his claims against Defendants for violation of, or retaliation under, the First Amendment. *See Ealom v. United States*, No. 18-3045-SAC, 2018 WL 1899135, *4 (D. Kan. Apr. 20, 2018) (alleged First Amendment retaliation fails to state a claim under *Bivens*); *Tatum v. Ladd-Smith*, No. 3:18-CV-01103 (VAB), 2018 WL 5299710, at *1 (D. Conn. Oct. 25, 2018) (declining to recognize *Bivens* remedy on prisoner's claim of First Amendment interference with access to courts); *Thomas v. Matevousian*, No. 17-cv-01592-AWI-PC, 2018 WL 5099763, * 7 (E.D. Cal. Oct. 18, 2018) (recommending against an implied *Bivens* cause of action for First Amendment retaliation or First Amendment denial of access to courts); *Vega v. United States*, 881 F.3d 1146, 1153 (9th Cir. 2018) (no *Bivens* remedy on prisoner's First Amendment claim for denial of access to courts); *K.B. v. Perez*, 664 F. App'x 756,

759 (10th Cir. 2016) (declining to recognize *Bivens* remedy on First Amendment claim by family of prisoner; noting prisoner could pursue remedy under Administrative Remedy Program); *Vanderklok v. United States*, 868 F.3d 189, 209 (3d Cir. 2017) (declining to recognize *Bivens* remedy on First Amendment retaliation claim against Transportation Security Administration agent).

### iii. Count 13

Count 13 alleges that Defendant Crews, a Disciplinary Hearing Officer, violated Plaintiff's Fifth Amendment rights when reconsidering disciplinary charges on Incident Report No. 2490024. Plaintiff alleges that Crews imposed a greater disciplinary sanction in retaliation for his "filings against her supervisory, co-workers and friends at USP Leavenworth." (Doc. 19 at 28.)

The Fifth Amendment's guarantee of due process in connection with a deprivation of liberty or property can be implicated by actions of prison officials against federal prisoners. Prisoners may have a protected liberty interest in freedom from actions that impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Wilkerson v. Austin*, 545 U.S. 209, 221 (2005) (citation omitted.) Certain procedural protections may also be required for actions involving the loss of good time credits or that otherwise extend a prisoner's sentence. *See Wolff v. McDonnell*, 418 U.S. 539 (1974).

For purposes of this opinion the court assumes, without deciding, that a *Bivens* remedy might be available for a deprivation of a liberty or property interest in violation of the due process clause of the Fifth Amendment. *Cf. Davis v. Passman*, 442 U.S. 228 (1979) (recognizing *Bivens* remedy for Fifth Amendment gender discrimination claim.)

The court concludes Defendant Crews is nevertheless entitled to qualified immunity on this claim. As an initial matter, Plaintiff cites no competent evidence that Crews in fact retaliated

against him because he filed grievances. Even accepting as true Plaintiff's contested allegation that Crews commented at the hearing that Plaintiff "liked to write up staff," the circumstances do not give rise to a reasonable inference of retaliation.[6]  Crews acted on the Regional Director's instructions mandating that a Code 203 violation be considered at the hearing and that the sanctions to be imposed needed to be "consistent with policy." The latter comment was ambiguous, and Crews could have reasonably understood it to mean the Director was instructing that a sanction consistent with a 200-level charge, which mandated loss of good time, should be imposed. Even though Crews's imposition of an increased sanction was later determined to be contrary to policy, there is no evidence reasonably suggesting it was a product of retaliation. Moreover, the error was remedied on appeal, and Plaintiff has failed to cite any evidence that he was deprived of a protected liberty interest as a result of Crews's actions. Plaintiff has thus failed to show that Crews's actions violated any Fifth Amendment right. In addition, Plaintiff fails to show that Crews's actions violated a Fifth Amendment right that was clearly established at the time. *See e.g., Tatum v. Shoemaker*, No. 10-cv-00296, 2012 WL 899633, *12 (W.D. Va. Mar. 16, 2012) ("Even assuming … that [defendant] retaliated against plaintiff for filing a grievance, such an act would not have been a violation of clearly established [Fifth Amendment] law because … various courts have reached different conclusions on the issue.") Crews is accordingly entitled to summary judgment.

### iv. Count 14

Count 14 alleges that Defendant Herbig violated Plaintiff's Fifth Amendment rights by approving of an unlawful seizure of Plaintiff's personal property by Defendant Witt on January 24, 2014. Plaintiff claims that Witt seized a magazine, newspaper, and religious medallion from

---

[6] Plaintiff's filing of grievances had some relevance at the disciplinary hearing. As a defense, Plaintiff asserted that he had previously filed a grievance against the guard who ordered him to "cuff up," and that he feared for his safety as a result, such that he refused to comply and requested that another officer be brought to the library to cuff him. (Doc. 72-5 at 9.)

him in January and February of 2014, in violation of due process, and that Herbig "implicitly authorized, approved and knowingly acquiesced in the unlawful seizure … when it was brought to his attention." (Doc. 19 at 19.) Herbig also allegedly "falsified information" concerning the seizure and failed to follow an institutional policy requiring consultation with the chaplain concerning seizure of religious items. (*Id.*)

The court concludes Herbig is entitled to qualified immunity on this claim. As an initial matter, Plaintiff fails to cite evidence showing he was deprived of property without due process of law. Even an intentional deprivation of property does not constitute a violation of procedural due process if an adequate post-deprivation remedy is available. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984). Plaintiff fails to genuinely controvert Defendants' evidence that USP Leavenworth had an adequate administrative remedy available to him to address the alleged deprivation of his property. Plaintiff makes no showing that he invoked or attempted to invoke these procedures. Moreover, Plaintiff fails to specify how Herbig personally participated in the alleged violation or "falsified information" that caused a deprivation of property without due process. (See Doc. 132-1 at 21 (Plaintiff asserting that "It was brought to my attention that … Herbig intentionally lied and falsely [interfered] with the investigation….")). Finally, Plaintiff fails to show that Herbig's actions violated clearly established Fifth Amendment law. For all of these reasons, Herbig is entitled to summary judgment.

### v. Count 15

Count 15 alleges that Defendant Leonhard violated Plaintiff's Fifth Amendment rights by threatening him and thereby "causing a chilling effect" on Plaintiff's exercise of his rights. For reasons previously stated, the court finds this claim is partially barred by Plaintiff's failure to exhaust remedies concerning Leonhard's alleged use of a racial slur. To the extent it is not barred,

Leonhard is entitled to the defense of qualified immunity. Plaintiff alleges that Leonhard "attempted" to handcuff him and threatened to lock him up, but he cites no evidence that Leonhard's actions actually deprived Plaintiff of a protected liberty interest, or that his actions violated clearly establish Fifth Amendment law.

### vi. Count 16

Count 16 alleges that Defendants Johnson and Maye violated Plaintiff's Fifth Amendment rights by transferring him from USP Leavenworth in retaliation for filing grievances against Maye and others. (Doc. 18 at 11; Doc. 19 at 36.)

Johnson and Maye are entitled to summary judgment on this claim for multiple reasons. First, Plaintiff fails to cite evidence showing he exhausted administrative remedies on claims that Johnson and Maye retaliated against him by transferring him out of USP Leavenworth or by sabotaging an attempted transfer to a lesser-security institution. Additionally, Plaintiff cites no evidence to reasonably support an inference that these Defendants brought about his transfer to a medium-security facility in retaliation for Plaintiff's filing of grievances. The uncontroverted facts show that Plaintiff requested a nearer-release transfer and that Johnson and Maye acted to further that request. The uncontroverted facts also show that DSCC - not Johnson or Maye – applied the management variable and made the ultimate transfer decision. Plaintiff sets forth a complicated theory of how Johnson and/or Maye destroyed his chances for a transfer to a lesser-security transfer to California, but he ultimately cites only conclusory statements in support of his retaliation theory. *See* Doc. 132-1 at 34 ("I was unjustly denied a near home transfer by (DSCC), by directive of … Johnson and/or BOP.")  Plaintiff cites no competent evidence to show that Defendants' conduct violated his Fifth Amendment rights or that the law protecting such a right was clearly established at the time. Defendants are thus entitled to qualified immunity on the claim.

### vii. Additional Claims

Plaintiff's filings contain a maze of allegations and claims. The court has reviewed the filings but finds they provide no basis for relief against any of the Defendants. To the extent any of the allegations were not specifically discussed in this order or in prior orders, the court concludes that the claims are without merit and that they must be dismissed.

**IT IS THEREFORE ORDERED** this 6th day of November, 2018, that Plaintiff's Motion for Extension of Time (Doc. 127), Motion to Appoint Counsel (Doc. 128), and Motion for Continuance (Doc. 130) are DENIED;

Plaintiff's Motion to Enlarge Page Limits (Doc. 131) and Motion for Leave to Supplement (Doc. 133) are GRANTED IN PART to the extent stated in this order; and

Defendants' Joint Motion to Dismiss (Doc. 71) is GRANTED. The clerk is directed to enter a judgment of dismissal in favor of all named Defendants, as to all of Plaintiff's claims.


_____s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE